# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

**FILED**
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 10:19 pm, Dec 21, 2007

In the matter of:                       )
                                        )            Chapter 11 Case
GLOBAL SHIP SYSTEMS, LLC                )
                                        )            Number <u>07-41815</u>
                            *Debtor*    )

## MEMORANDUM AND ORDER
## ON MOTIONS TO DISMISS AND FOR RELIEF FROM STAY

This case began as an involuntary Chapter 11 filed on November 5, 2007. No answer was timely filed, and an Order for Relief was entered on December 5, 2007. Drawbridge Special Opportunities Fund, L.P. ("Drawbridge"), the major lender to Global Ship Systems, LLC ("Global"), seeks dismissal or relief from the automatic stay, and after a trial on the merits conducted on December 18 and 19, 2007, I enter the following Findings of Fact and Conclusions of Law.

### Findings of Fact

The parties entered a stipulation of facts which is incorporated herein verbatim:

In accordance with the Court's Scheduling Order, dated November 19, 2007, the parties hereby stipulate to the following facts for use at trial:

✎AO 72A
(Rev. 8/82)

1.     In April 2004, Robert Creech and several other individuals[1] arranged to purchase a shipyard consisting of real and personal property in Savannah, Georgia, from Palmer Johnson Savannah, LLC, and Nobelsea, LLC, for a gross purchase price of $14,000.000. (Operating Agreement, Global Ship Systems, LLC; Operating Agreement, GSS Operations, LLC.)

2.     In connection with this purchase, two entities were organized: Global Ship Systems, LLC, the Debtor herein ("Global" or "Debtor"), and GSS Operations, LLC, ("Operations").

3.     The real estate and the personal property listed in the Purchase and Sale Agreement (FCO-Global 000367) as Exhibit A (real property description) and Exhibit C (description of personal property) were purchased by Global. (FCO-Global 000367, 000351.) Global leased the real property located at 301 North Lathrop Avenue to Operations pursuant to a lease (FCO-Global 000631) in which (a) Operations paid all the expenses associated with the property (a "triple net" lease), and (b) the rent paid by Operations was equal to the debt service on the Drawbridge loan. (Operating Agreement, Global Ship Systems, LLC; Operating Agreement, GSS Operations, LLC; Lease from Global to Operations).

4.     Global held title to the real and personal property that was purchased. Operations, as lessee of the real property, conducted the ship refit and repair business (the "Business"). (Operating Agreement, GSS Operations, LLC, Art. II, § 2.5; Robert Creech Dep. at 20:13-23; 72:17-19; 80:21-81:16; Hebert Dep. at 12:16-13:3.)

5.     Fortress Credit Corp ("Fortress") and Drawbridge Special Opportunities Fund, L.P. ("Drawbridge") are affiliates of Fortress Investment Group, a leading global alternative asset manager (*See* http://www.fortressinv.com/ (last visited Nov. 28, 2007).)

6.     To help finance the purchase by Global, Fortress agreed to extend a loan to Global and Operations (the "Loan"), and the parties executed a loan agreement dated as of June 8, 2004 (the "Loan Agreement"),

---

[1] Robert Creech, James Stribling, Patrick Emmet, Mark Hornsby, John Bennett, Linford Brown, and Kevin Jackson are the Class A members of Global Ship Systems, LLC, the Debtor herein. All except Jackson are also Class A members of GSS Operations, LLC.

2

together with a Promissory Note, Deed to Secure Debt, and other collateral documents. (Loan Agreement; Promissory Note; Deed to Secure Debt, Security Agreement and Fixture Filing, dated June 8, 2004).

7.      The Loan was a joint and several obligation of both Global and Operations (collectively, the "Borrowers"). (Loan Agreement, at 1.)

8.      The Loan was intended as a bridge loan, to enable Global and Operations to complete the acquisition and then obtain replacement financing.

9.      The Loan Agreement also contained provisions allowing for an approximate three-year maturity if replacement financing could not be obtained. (Loan Agreement § 2.2, at 13-14.)

10.     The Loan was assigned by Fortress to Drawbridge, and perfection of Drawbridge's security interests in the joint borrowers' real and personal property was properly accomplished under Georgia real estate law and the UCC. (Assignment of Deed to Secure Debt; Security Agreement and Fixture Filing and Assignment of Leases and Rents; Assignment of Loan Documents; Promissory Note Assignment of Deed to Secure Debt.)

11.     Per the Loan Agreement, the initial interest rate on the Loan was 18% per annum. (Loan Agreement, at 7).

12.     Global and Drawbridge entered into multiple amendments to the Loan Agreement. (FCO-Global 001072 (First Amendment), 001080 (Second Amendment), 001089 (Third Amendment), 991563 (Fourth Amendment).)

13.     At the closing of the Loan, Fortress disbursed $12,876,012.89, and received a promissory note for $13.1 million (which included a fee of $262,000) and an "equity kicker" in the form of a Class B equity interest, then equal to a 20% equity interest in each entity. (Loan Agreement, § 2.1(B).)

14.     On May 8, 2007, the Loan matured (Loan Agreement, at 12) and Drawbridge sent a notice of default to Global and Operations. (June 29,

✎AO 72A

(Rev. 8/82)

2007 Letter from Fortress Credit Corp. to Global Ship Systems, LLC.)

15.     On June 7, 2007, Global and Operations entered into a Fourth Amendment to the Loan Agreement, through which Drawbridge made an additional $484,082.49 available to Borrowers under the Fourth Amendment. (Fourth Amendment to Loan Agreement, at 2.)

16.     On July 12, 2007, Drawbridge terminated the lease of real property from Global to Operations. (July 12, 2007 Letter from Constantine Dakolias to Global Ship Systems, LLC and GSS Operations, LLC; Assignment of Leases and Rents, at § 3.1.)

17.     In July and August 2007, Robert Creech, the CEO of Global, proposed a deal with Edison Chouest, in which, in response to a $17.5 million offer from Chouest, Mr. Creech countered with a request for $18.5 million together with what he described as a "Golden Handcuffs" contract for himself for five years at $215,000 per year plus bonuses. (Aug. 27, 2007 Fax and Letter from Robert Creech to Dino Chouest.)

18.     On October 11, 2007, Drawbridge issued notices of foreclosure and arranged for the publication of a notice of sale, which ran during each of the four weeks preceding the sale date. (Oct. 11, 2007 Letter from Kathleen Horne to Global Ship Systems, LLC; Notice of Sale (Shipyard in Savannah).)

19.     On October 31, 2007, the Debtor and Operations filed a complaint against Drawbridge in the Superior Court of Chatham County and also a Motion for Temporary Restraining Order ("TRO Motion") to restrain the foreclosure sale. (Compl. for Damages and Pet. for Temporary & Interlocutory Relief, Oct. 31, 2007; Pl.'s Mot. for TRO, Oct. 31, 2007.)

20.     On November 2, 2007, after hearing, the Superior Court denied the TRO Motion. (Order on Mot. for TRO, Nov. 2, 2007.)

21.     The state-court complaint was later withdrawn without prejudice. (Voluntary Dismissal Without Prejudice, Nov. 20, 2007.)

22.     On the morning of November 6, a joinder in the involuntary

4

petition[2] was filed on behalf of Fred Clark and S. Larry Phillips. (Amended Involuntary Pet., Nov. 6, 2007.)

23.     A fourth petitioning creditor, Global Environmental Assurance, Inc., filed a joinder in the involuntary petition on November 7. (Amended Involuntary Pet., Nov. 7, 2007.)

24.     Finally, on November 7, Jane H. Holmes, Clark, Phillips, and Global Environmental Assurance, Inc. (collectively, the "Petitioning Creditors") filed a joint amended petition. (Joint Amended Pet., Nov. 7, 2007.)

25.     At 11 a.m. on November 6, 2007, Drawbridge conducted a foreclosure with respect to Operations, and announced a credit bid of $1 million.  (Bill of Sale, Nov. 6, 2007.)

26.     Because of the filing of the involuntary case as to Global, an automatic stay was in place as to any foreclosure by Drawbridge with respect to Global's assets.  Drawbridge filed an Emergency Motion for Limited Relief from Stay, seeking the right to proceed with the foreclosure but not record a deed of foreclosure pending further order of the Court.  (Emergency Mot. for Limited Relief from Stay, Nov. 6, 2007.)

27.     The Court conducted a hearing on the Motion on November 6 and did not grant the full relief sought by Drawbridge. (Trans. of Emergency Mot. Hr'g, Nov. 6, 2007, at 60:12-13, 69:12-14.)

28.     However, the Court permitted Drawbridge to continue to advertise the foreclosure sale for December 4, 2007. (Trans. of Emergency Mot. Hr'g, Nov. 6, 2007, at 60:15-18).

29.     Per the financial statement for both Global and Operations as of December 2004, 2005 and 2006, and April 2007, from a combined standpoint, Global and Operations operated at a loss, on both an EBITA and Net Income basis, since the inception of these entities. (Global Ship Systems & Affiliates Statements of Income, Dec. 31, 2006 (Creech Dep.

---

[2] It was not expressly stipulated, but the record reveals that an involuntary petition was filed by Jane Holmes at 10:47 p.m., on November 5, 2007.

AO 72A
(Rev. 8/82)

Ex. 4); Global Ship Systems & Affiliates Statements of Income, April 30, 2007 (Creech Dep. Ex. 5); Global Ship Systems & Affiliates Statements of Income, Dec. 2004 (Creech Dep. Ex. 6); Global Ship Systems & Affiliates Statements of Income, Dec. 31, 2005 (Creech Dep. Ex. 7)):

Global Ship Systems, LLC and
GSS Operations, LLC
Combined Results (Unaudited and uncertified)

| Year | EBITDA | Net Income (Loss) |
|---|---|---|
| 2004 | (603,085) | (3,095,310) |
| 2005 | 319,538 | (5,839,732) |
| 2006 | 633,765 | (7,625,093) |
| 2007 (to April) | (788,490) | (3,884,428) |
| Totals | (438,272) | (20,444,563) |

From the evidence at trial I make additional Findings of Fact as follows:

1)    The involuntary case was initiated by a single party, Jane Holmes, who was later joined by Fred Clark and Larry Phillips, both practicing attorneys in Coastal Georgia.  All three claim creditor status in relation to Global.

2)    Jane Holmes advanced $1.5 million to Global and is an equity holder, not a creditor, except to the extent she can prove creditor status by virtue of her potential right to receive dividends.  Operating Agreement, Joint Exhibit No. 3, Schedule A;

Agreement re: Investment & Employment, Joint Exhibit No. 28 (June 8, 2004).

3)      Holmes, Clark and Phillips were solicited, encouraged or perhaps urged by Creech on behalf of Global to file the involuntary case against Global.

4)      Drawbridge's initial $13.1 million advance and subsequent advances were governed by various loan agreements. *See* Joint Exhibit Nos. 1-2GG. The Loan Agreements are governed by New York law. *See* Loan Agreement, Joint Exhibit No. 1, § 10.11.

5)      Creech, Drawbridge, and Holmes were among the parties who entered into an Operating Agreement for the structure, management, and governance of the LLC. Drawbridge was issued Class B equity interests valued initially at 20% of Global. Operating Agreement, Joint Exhibit No. 3, Schedule A.

6)      The Operating Agreement is governed by Georgia law and prohibits certain actions by Global unless the consent of the Class B shareholder (Drawbridge) is obtained:

(b) Each of the following shall constitute a Class B Consent Action for the purposes hereof:

7

(i)     Amending, modifying or repealing the Articles of Organization or this Agreement or any certificate of incorporation, by-laws, certificate of formation, operating agreement, partnership agreement or similar governing document of any Subsidiary of the Company.

(ii)    Effecting a merger or consolidation of the Company or any Subsidiary thereof with, or sale or other disposition of any substantial part of the assets of the Company or any Subsidiary to, any Person (other than sales or other dispositions of assets in the ordinary course of business).

(iii)   Effecting a spin-off, split-off or other form of de-merger involving any Subsidiary of the Company.

(iv)    Mortgaging or granting, or permitting to exist, a lien or security interest of any nature in any of the assets of the Company or any of its Subsidiaries other than Permitted Liens.

(v)     The Company or any Subsidiary thereof acquiring, directly or indirectly, any ownership interest in, or assets of, or all or part of any business of, any Person (other than the acquisition of equipment or supplies required for the operation, repair or maintenance of the Shipyard in the ordinary course of business).

(vi)    The company or any Subsidiary thereof participating in any joint venture, strategic alliance partnership or other business association with any other Person or any incorporation or formation of additional legal entities in which the Company or any of its Subsidiaries would have an equity interest.

(vii)   Dissolving, liquidating, winding up or terminating the Company or any Subsidiary thereof.

(viii)  The Company or any Subsidiary thereof commencing a Voluntary Bankruptcy or deciding not to contest an Involuntary Bankruptcy.

7)      While some of the consent requirements expire upon payment of the

8

Drawbridge loan in full, the consent requirement concerning bankruptcy filings survives the extinguishment of the debt. Thus, Drawbridge's right in the Operating Agreement to prevent a bankruptcy filing to which it does not consent is dependent solely on its status as an equity holder. Operating Agreement, Joint Exhibit No. 3, § 6.4(c), p.27.

8)      Creech asked Drawbridge to consent to Global's filing a voluntary bankruptcy. Drawbridge replied, requesting an explanation why it was in its interest to consent. Creech did not respond and provide such a rationale, and Drawbridge did not consent to the filing of this case.

9)      The debt owed to Drawbridge as of the filing of the involuntary petition is approximately $38 million.

10)     A major element of any plan which Global might propose is a sale of the shipyard with a pay down or payoff of the Drawbridge debt, or refinancing of that debt with an outside lender.

11)     When the original loan was made, Global utilized the Drawbridge credit to acquire the shipyard. Prior to borrowing these funds from Drawbridge, Global had sought other financing unsuccessfully and thereafter turned to Drawbridge as a lender of last

AO 72A
(Rev. 8/82)

resort. The loan was structured as a short-term bridge loan in the expectation that Global could find long-term financing in short order. This it was unable to do. Fortunately, the initial loan was structured to permit Global, upon payment of certain fees and acceptance of a higher rate of interest, to extend the term to a maximum of thirty-five months. The loan was extended as evidenced by the subsequent loan agreements.

12)     Because of the interest rate applicable to that thirty-five month maturity, and its intermediate term, Global at all times was desirous of acquiring more equity, new financing, or both, to pay Drawbridge off and achieve longer term stability in servicing its debt. Numerous efforts to refinance were made and failed.

13)     Global finds itself today in the same position, with the same needs for capital or financing, as it has been in since 2004. In the interim, the economic forecasts for the business have not been met, it has operated at a substantial loss, and future prospects are uncertain at best. On the other hand, the intrinsic value of the shipyard is appraised at a higher value than in 2004: $16 million. On balance, in light of the accrued losses, current negligible cash flow, but higher real estate value, Global's economic picture is worse today than it was in 2004.

14)     In this context, Global signed a Purchase and Sale Agreement with

10

Hampton Island Yacht Club, LLC ("Hampton"), which it proffers as the financial component of a possible Chapter 11 plan. In that agreement, Hampton offers (subject to due diligence and other conditions) to purchase the land, buildings, fixtures, equipment and intangibles for $13.1 million. (That price includes Operations' equipment already foreclosed upon by Drawbridge. It is unclear whether the price would be reduced if that equipment cannot be acquired.).

        15)    The agreement also provides a "Participation Agreement" as additional consideration. The terms state:

> (d)    To induce Seller to enter into this Agreement, Purchaser agrees to enter into an agreement with Seller (the "Participation Agreement") at Closing pursuant to which Seller shall be entitled to receive a percentage of the net operating cash flow from the Property, if any, each year for the first five (5) years following the Closing Date. The terms and conditions of the Participation Agreement including, without limitation, the calculation of the applicable "percentage" to be applied to net operating cash flow and the calculation of "net operating cash flow" thereunder, shall be determined by Purchaser and Seller prior to the Due Diligence Date (as hereafter defined). Seller agrees to negotiate in good faith the terms of the Participation Agreement. Negotiation and execution of this Agreement are absolute conditions precedent to Purchaser's and Seller's obligation to close the purchase and sale of the property.

AO 72A
(Rev. 8/82)

Exhibit 130, ¶ 2(d).

Even a casual review of this language reveals that it is little more than an agreement to negotiate in good faith toward a contract.  It has no terms which would support even the most tentative assessment of its present-day or five-year value to seller.  Nor was there testimony to establish the minimal outlines of a deal.  *See* Creech Dep., pp. 13-16, 17, 22, 30, 32-3, 36 (December 13, 2007).

## CONCLUSIONS OF LAW

### I.  The Motion to Dismiss

In its Motion to Dismiss, Drawbridge asserts that Global is ineligible to be a debtor because Holmes is an equity holder, not a creditor, and Clark and Phillips are creditors of Operations and not Global.  If true, these contentions would establish that the involuntary petition was not filed by the requisite three creditors required for an involuntary case by 11 U.S.C. § 303 (b)(1).  In the ordinary case, this defense would be raised by the defendant/debtor.  Here, Global has not filed defensive pleadings asserting this affirmative defense to the involuntary case and, indeed, appears to wish the case to have been filed and remain pending, so the ineligibility issue was not joined by the party ordinarily expected to raise that issue.  For this reason, the case went into default and an Order for Relief was entered on December 5, 2007, adjudicating Global bankrupt.  Order for Relief, Dckt. No. 78

(December 6, 2007).

The eligibility issue is now raised by Drawbridge, but under longstanding authority, a creditor lacks standing to contest an involuntary petition. *See* 11 U.S.C. § 303(j); Id. § 303(d); Fed. R. of Bankr. P. 1011; Carlson Plywood Co. v. Vytex Plastics Corp., 519 F.2d 556, 557-58 (7th Cir. 1975); In re Taylor & Assoc., 191 B.R. 374, 378 (Bankr. E.D.Tenn. 1996). Nevertheless, the argument that the petitioning creditors did not have standing to initiate an involuntary case is an element that this Court could, but does not need to, consider in determining whether the case was filed in bad faith and/or whether cause exists to grant the Motion to Dismiss under 11 U.S.C. § 1112. *See* General Trading, Inc., v. Yale Materials Handling Corp., 119 F.3d 1485, 1501-02 (11th Cir. 1997); In re Key Auto Liquidation Center, Inc., 372 B.R. 74, 77 (Bankr. N.D. Fla. 2007).

Instead, the traditional good faith/bad faith analysis which is equally applicable to involuntary cases as it is voluntary cases is the basis for this ruling. *See* In re Springs Hospitality, Inc., slip op., 2006 WL 2458679, *2 (Bankr. D. Col. 2006); In re F.R.P. Indus. Inc., 73 B.R. 309, 312-313 (Bankr. N.D. Fla. 1987); In re Vincent J. Fasano, Inc., 55 B.R. 409 (Bankr. N.D.N.Y. 1985) *rev'd on other grounds* U. S. Fidelity & Guar. Co. v. DJF Realty & Suppliers, Inc., 58 B.R. 1008 (N.D.N.Y. 1985). "[T]he court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever

13

is in the best interests of creditors and the estate if the movant establishes cause . . ." 11 U.S.C. § 1112(b)(1). Although § 1112(b)(4) contains a list of factors that may constitute "cause," that list is not exhaustive. H. R. Rep. No. 95-595, at 406 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6362 ("[The] list [contained in § 1112(b)] is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.").

To the extent that involuntary case fact patterns provide insufficient guidance, voluntary case decisions do. The fact is that the petitioning creditors' participation in this case was solicited by the Debtor which was prohibited by the Operating Agreement from filing a voluntary case without Drawbridge's consent. In substance, therefore, this "involuntary case" is the functional equivalent of a voluntary Chapter 11, and Debtor's acts in orchestrating the filing are relevant.

In this Circuit, there is clear and long established guidance which holds that a Chapter 11 case which is not filed in good faith can be dismissed for "cause." In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984); In re Phoenix Picadilly, Ltd., 849 F.2d 1393, 1394 (11th Cir. 1988). The factors a trial court should consider in making that determination include:

14

AO 72A
(Rev. 8/82)

1)      Whether the debtor is a so called single asset debtor.

2)      Whether the debtor has relatively few unsecured claims whose claims are small in relation to those of secured creditors.

3)      Whether the debtor has a limited number of employees.

4)      Whether the asset of the debtor is subject to a pending foreclosure action as a result of arrearages on the indebtedness.

5)      Whether the debtor's financial problems involve largely a dispute between the debtor and secured creditors which can be resolved in a pending State Court action.

6)      Whether the timing of the debtor's filing evidences an attempt to delay or frustrate the legitimate efforts of the secured creditors to enforce their rights under state law.

Albany Partners, 749 F.2d at 674; Phoenix Picadilly, 849 F.2d at 1344; In re Oakbrook Village, Inc., 108 B.R. 838, 844 (Bankr. S.D.Ga. 1989).

The fact that a debtor has prospects for a successful reorganization does not necessarily override a finding of bad faith so as to negate a dismissal.  Phoenix, Id.

In evaluating this case, most of the classic indicators of bad faith are present:

1)      The case was filed only hours before a scheduled non-judicial

15

foreclosure under state law.

2)      It was filed only after a prior effort to enjoin the state-law foreclosure was rebuffed by the Superior Court Judge before whom the temporary restraining order was sought.  Order on Motion for Temporary Restraining Order, Joint Exhibit No. 53 (Nov. 2, 2007).  At the time of this filing, that state court litigation was still pending.

3)      The Debtor has no employees and no operating business.  Instead, Global owns a parcel of real estate which it leased to Operations, a related entity, and those lease payments are the sole source of revenue from which Global planned to fund its debt-reduction payments to Drawbridge.

4)      Debtor never had any significant number of employees, and as of the date of filing, it had none. It has no cash with which to fund expenses.

5)      At the emergency hearing on November 16, Global asserted that it had fewer than twelve creditors in order to defend the assertion that the case was defective because three creditors had not joined in the petition.  Its April 2007 balance sheet shows zero receivables and accrued payables to Holmes of approximately $383,000.00.  Now, at trial, it contends that it has over 240 creditors who are owed approximately $3 million.  Even

16

this larger amount of "debt" of dubious enforceability against Global is dwarfed by the $38 million claim of Drawbridge.

The amount of the Drawbridge debt has constantly and vigorously been disputed by Global. However, upon consideration of all the evidence, I find the issues raised by Global to be spurious. A fair reading of the loan documents and the testimony of Dan Gropper establish conclusively that Drawbridge has correctly accounted for and calculated the amount due on the foreclosure date to be $38,030.016.84.[3] Joint Exhibit No. 85. In particular, Global has maintained that the interest rate charged by Drawbridge violates New York usury laws. This contention is flatly wrong. *See* <u>N.Y. Gen. Oblig. Law</u>, § 5-501(6)(b) ("No law regulating the maximum rate of interest which may be charged, taken or received . . . shall apply to any loan or forbearance in the amount of two million five hundred thousand dollars or more.").

6)    The timing of the filing shortly after the Temporary Restraining Order was denied by the Superior Court of Chatham County, Georgia, evidences an intent to delay or frustrate the legitimate efforts of Drawbridge to enforce its rights.

Thus, the case falls squarely within the parameters which classically define

---

[3] Drawbridge bid $1 million for assets of Operations that were sold on that date and the debt is now reduced by that sum.

a bad faith filing. In addition, other factors point toward, indeed demand, such a conclusion.

The involuntary case is a pure subterfuge for a voluntary petition, filed by creditors at the instigation of Global or its managers/members. Global borrowed over $14 million from Drawbridge. It took further advances bringing the principal debt to over $18 million. It agreed to allocate some of the funds advanced to equity. As a result Drawbridge holds both debt and equity positions in Global. As an equity interest holder, Drawbridge was granted certain protections in the governance of the LLC. Global could not sell substantially all its assets, merge with another company, or file a voluntary bankruptcy case without the consent of Drawbridge. Operating Agreement, Joint Exhibit 3, ¶ 6.4. An absolute waiver of the right to file bankruptcy is violative of public policy if asserted by a lender. Fallick v. Kehr (In re Fallick), 369 F.2d 899, 904 (2d Cir. 1966); In re Shady Grove Tech. Center Assoc. Ltd. P'Ship., 216 B.R. 386, 390 (Bankr. D. Md. 1998) *order supp. by* 227 B.R. 422 (1998); In re Madison, 184 B.R. 686, 690 (Bankr. E.D. Pa. 1995); In re Gulf Beach Dev. Corp., 48 B.R. 40, 43 (Bankr. M. D. Fla. 1985). However, since Drawbridge wears two hats in this case, as a Class B shareholder, it has the unquestioned right to prevent, by withholding consent, a voluntary bankruptcy case. Operating Agreement Joint Exhibit No. 3, ¶ 6.4(b)(viii); *see* ¶ 6.4(c) (While several consent actions became moot upon full payment of the loan, the Class B consent requirement for filing bankruptcy survives.).

18

Georgia law is clear in that it permits, to the maximum extent possible, parties to exercise freedom of contract in the structuring of LLC's. Ledford v. Smith, 274 Ga. App. 714, 724 (Ga. App. 2005). Members of an LLC are statutorily empowered to make all decisions in managing the LLC subject to the operating agreement. That document may contain any provision relating to any phase of managing the business. O.C.G.A. § 14-11-304(a); see O.C.G.A. § 14-11-308. The Operating Agreement for Global is very clear. Any decision to file a voluntary bankruptcy required the consent of Drawbridge as a Class B equity member. To accord full effect to Georgia's legislative determination that LLC's should be granted extremely broad discretion in the organization and the management of their affairs, I conclude that Drawbridge retained a separate right, as an equity holder, to refuse to consent to the filing of a voluntary bankruptcy case. It is uncontradicted that Creech initiated telephone calls to Holmes and others after the Superior Court denial of the Temporary Restraining Order, advising them that the pending foreclosure had not been halted and that an involuntary bankruptcy case was their only option to protect their interests. In circumventing the rights of Drawbridge as a shareholder to consent to a bankruptcy filing through the ruse of soliciting an involuntary case and failing to contest the involuntary petition once it was filed, Global engaged in bad faith toward Drawbridge.

It should be emphasized that the fact that an involuntary case is filed at the suggestion of a debtor to circumvent corporate bylaws provisions limiting the filing of a

✎AO 72A
(Rev. 8/82)

bankruptcy case without consent of certain parties is only suggestive of, and not conclusive evidence of, bad faith. In re Kingston Square Assoc., 214 B.R. 713, 733-35 (Bankr. S.D.N.Y. 1997). In Kingston, the orchestrated filing was ultimately permitted because the court found there to be a good faith belief by creditors that it was the only avenue to prevent foreclosure which would "wipe out" existing equity in Debtor's real estate. That equity was not ephemeral or speculative but was evidenced by an appraisal. The existence of equity which could be preserved for unsecured creditors' and limited partners' benefit in a bankruptcy proceeding was sufficient to negate the suggestion of bad faith. *Accord* In re Mi La Sul, 2007 WL 3357673 (Bankr. C.D.Cal. 2007). In contrast, here, the debt held by Drawbridge, unquestionably, far exceeds the value of its collateral and there is simply no basis to believe that unsecured and equity interest holders will be any worse off after a foreclosure than they were before.

In this Circuit, the fact that there may be prospects for reorganization does not negate a finding of bad faith as a matter of law. Phoenix Picadilly, 849 F.2d at 1395 ("[A] possible equity in the property or potential successful reorganization . . . cannot transform a bad faith filing into one undertaken in good faith."). Clearly, a debtor's orchestration of an involuntary case is a factor which can be added to the non-exclusive list of criteria for evaluating good/bad faith. Thus, in light of all the factors, even if I conclude that a feasible reorganization is in prospect, it would not demand a different conclusion. And for the reasons set forth in Part II *infra*, Global has failed to prove that there is such a

prospect.  For the foregoing reasons, the Motion to Dismiss will be granted.

Finally, 11 U.S.C. § 1112(b)(1) provides for dismissal of Chapter 11 cases on request of a "party in interest" for "cause."  Section 1112(b)(4) sets forth a non-exclusive list of what may constitute cause.  As applied to the facts in this case, I find that cause for a dismissal exists not only based on my findings of bad faith, *supra*, but because there is (1) "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;" (2) "failure to maintain appropriate insurance that poses a risk to the estate or to the public;" and (3) "failure to timely pay taxes owed after the date of the order for relief . . ."  Since Debtor has no cash in its bank account, it is unable at the present time to pay (1) a county ad valorem tax bill currently due in the amount of over $55,000.00; and (2) insurance premiums, which accrue on its property, casualty, and liability policies covering its premises, exceeding $40,000.00 per month for which it has no source of payment.

The only possible source for the payment of its accruing obligations to the local taxing authorities, for providing the necessary insurance, or indeed any other ongoing expenses, is, according to Mr. Creech's testimony, the agreement by Hampton to fund the current cash needs of the business during a period of due diligence afforded to it under the pending purchase and sale contract (Exhibit 130).  Mr. Creech characterized the Hampton commitment to be co-extensive with the needs of the Debtor for funding during this interim

period. It was not dependent upon Hampton being granted any priority or secured status as to those advances nor on any shared participation by Drawbridge. However, Mr. Leventhal's (Hampton's representative) testimony was directly contradictory on all these points. I therefore find the suggestion that Hampton will provide the source of funding these payments, constituting the minimum adequate protection necessary to maintain insurance, payment of taxes, and to prevent continuing loss to the estate to be completely non-persuasive. For these reasons, cumulative as well as independent grounds for dismissal of this case are present under § 1112.[4]

---

[4] In dismissing this case, I am mindful of the provisions of § 303(i) which authorize, but do not require, an award of costs, attorneys' fees, and actual and punitive damages against petitioning creditors. Upon review of the entire record, I find that such an award is not appropriate.

Drawbridge argued that Holmes did not qualify to serve as a petitioning creditor because she is an equity holder not a debt-holder and thus had no standing to file an involuntary case. See 11 U.S.C. § 303(b); In re Royal Gate Assoc. Ltd., 81 B.R. 165,167 (Bankr. M.D. Ga. 1988). While shareholders may have the same enforcement rights as creditors under state law, there is an exception which may negate this status for her if she was not "entitled" to receive a distribution at the time of filing. O.C.G.A. § 14-11-409 ("At the time a member becomes entitled to receive a distribution, the member has the status of, and is entitled to all remedies available to, a creditor of the limited liability company with respect to the distribution."). Holmes possibly was not "entitled" to receive a distribution because (1) Section 9.3 of the Operating Agreement provided no distribution could be made if it would cause Global to be in default under the Loan Agreement; (2) Section 5.29 of the Loan Agreement did not permit Global to make any distributions to members as long as the debt to Drawbridge was outstanding; and (3) O.C.G.A. § 14-11-407 forbade it.

Nevertheless, Global, Operations, and Southeastern Industrial & Marine Services, Inc. ("SIMS"), entered into another agreement with Holmes (1) agreeing "the companies shall cause to be paid a cumulative, preferred dividend to Holmes as a result of the Holmes Investment in an amount not less than [10%] of the Holmes Investment for the period" of one year; (2) employment as a consultant on behalf of SIMS; and (3) agreeing "the companies or the GSS principals, individually or collectively, shall make minimum cash distributions or non-refundable advances (but offset against dividends . . . ) in an amount equal to the amount of any required quarterly payments on such loan." Agreement re: Investment and Employment, Joint Exhibit 28, ¶¶ 2.4, 3, and 4 (June 8, 2004). That agreement provided that to the extent their agreement conflicted with the terms in the loan or operating agreements, the agreement with Holmes would prevail. Id., ¶ 1.3. Some payments were made to Holmes, but large unpaid amounts were accrued on the company's books not as equity but as liabilities. Global Ship Systems and Affiliates Combined Balance Sheet (As of December 31, 2006), Joint Exhibit No. 21.

Creech testified that he believed the existence of this "side" agreement with Holmes had been revealed to closing counsel for Drawbridge, but he was not able to produce any direct evidence of that fact. However, Holmes' testimony at her deposition established that Global's closing counsel informed her that the side agreement could not be signed until Drawbridge was informed of it and later informed her that a copy of the side agreement had been provided to Drawbridge when the loan closed a week later. See Holmes Dep. pp. 66-68 (November 13, 2007).

While I have insufficient facts to conclude whether this sequence of events resulted in a modification of the Loan

## II.  The Motion for Relief from Stay

Alternatively, Drawbridge seeks relief from the automatic stay of § 362 to permit foreclosure.  Section 362(a) provides:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of–
>
> (1)     the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the

---

and Operating Agreements or a waiver by Drawbridge of its right to complain about payments that were made, it is sufficient to support Holmes' good faith belief that she was "entitled" to certain distributions and thus had the enforcement rights of a creditor.

Indeed, large amounts due to her were accrued on the company's balance sheet as liabilities, in addition to showing her as an equity holder in the amount of $1.5 million. Global Ship Systems and Affiliates Combined Balance Sheet (As of December 31, 2006), Joint Exhibit No. 21.

In light of the presumption that petitioning creditors act in good faith in filing an involuntary case, and the extremely high standard required to overcome that presumption, I conclude that no discretionary award of fees and costs nor any damages for bad faith in filing the petition is warranted.

In considering petitioning creditors' motivation, courts have generally required nearly unconscionable behavior before finding bad faith.  For example, in In re Trans High Corporation, 3 B.R. 1, 4 (Bankr. S.D.N.Y. 1980), the court required a showing that the petitioning creditor was consciously and "wickedly indifferent" to the truth or falsity of allegations contained in the petition, before it would find bad faith by the creditor.  Similarly, in In re Howard, Nielsen & Rush, Inc., 2 B.R. 451 (Bankr. N.D.Tenn 1979), the court found no bad faith in the absence of proof that the petition was "filed groundlessly with intent to harass, vexatiously or oppressively."

U. S. Fidelity & Guar. Co. v. DJF Realty & Suppliers, Inc., 58 B. R. 1008 (N.D.N.Y. 1986).

Moreover, while Drawbridge contends that Clark and Phillips were creditors of Operations and not Global, I find they had a good faith reason to believe that Global was their client.  Clark Dep. p. 25 (November 13, 2007); Phillips Dep. p.13 (November 15, 2007).  Any confusion or ambiguity over the role they played in relation to Global as opposed to Operations arises entirely because Creech blurred the separate identities of the companies in his dealings with these two creditors.

In short, the bad faith on which this ruling depends is solely that of Global or its management and not the petitioning creditors.

debtor that arose before the commencement of the
case under this title;

Section 362(d) provides:

> (d) On request of a party in interest and after notice and a
> hearing, the court shall grant relief from the stay provided
> under subsection (a) of this section, such as by
> terminating, annulling, modifying, or conditioning such
> stay–
>
> (1)   for cause, including the lack of adequate protection
>       of an interest in property of such party in interest;
>
> (2)   with respect to a stay of an act against property
>       under subsection (a) of this section, if–
>
>       (A) the debtor does not have an equity in such
>       property; and
>
>       (B) such property is not necessary to an effective
>       reorganization;

The burden of proof on the question of a debtor's lack of equity in property

lies with Drawbridge. 11 U.S.C. § 362(g)(1). I conclude that Drawbridge has met its burden

of proving lack of equity in the property. The highest and most recent appraisal sets the value

of the property "as is" at $16 million. Complete Appraisal Summary Report, Joint Exhibit

No. 67 (October 20, 2007). The "as is" condition of the property includes a marine railway

and graving dock which are currently in need of repair. Global has pending litigation seeking

to force its insurer to repair previous damage to the marine railway and graving dock and to

pay damages for business interruption which reduced Global's revenues. That litigation is hotly contested and no early resolution is apparent. Despite the delays, uncertainties, and costs inherent in civil litigation, the likeliest outcome of that case may be a significant recovery. Whatever the amount, however, the timing of any recovery is too remote for the Court to assign a value to it at this moment. With debt in excess of $37 million and value, in the best case scenario, of $18 million,[5] there clearly is no equity. Drawbridge has met its burden of proof. Ultimately, Debtor conceded this point, though not the precise numbers, at trial.

Global now bears the burden of proving that the property is necessary to an effective reorganization. 11 U.S.C. § 362(g)(2). To meet this burden, Global must make "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means . . . that there must be 'a reasonable possibility of a successful reorganization within a reasonable time'. . . . And while the bankruptcy courts demand less detailed showing during the four months in which the debtor is given the exclusive right to put together a plan, *see* 11 U.S.C. § § 1121(b)(c)(2), even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief." United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 375-76, 108 S.Ct. 626, 633 (1988); *see* cases collected in footnote two at 376.

---

[5] Based on prior "offers," not the Considine appraisal.

Drawbridge contends that no such proof has been made, and I agree.  First, "where it appears that the proposed arrangement cannot be effected as a matter of law, then it would be equally unwise to permit the case to proceed any further."  It is incumbent upon Global to demonstrate that it could, as a matter of law, reach cramdown under Section 1129(b) of the Code.  In re Anderson Oaks (Phase 1) Ltd. P'ship, 77 B.R. 108, 111 (Bankr. W.D. Tex. 1987); *see* Am. Network Leasing, Inc. v. Apex Pharm., Inc. (In re Apex Pharm., Inc., 203 B.R. 432, 444 (N. D. Ind. 1996)("Relief from stay is appropriate where there is no reasonable likelihood of reorganization due to creditor dissent."); In re 6200 Ridge, Inc., 69 B. R. 837, 843 (Bankr. E.D. Pa. 1987)("Most courts which have considered the issue have also held that the reference to an 'effective reorganization' . . . requires that relief from stay be granted if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations.").

Drawbridge now holds a net claim totaling over $37 million secured by real estate valued at no more than $18 million.  As such it holds, for purposes of confirmation, a secured claim of $18 million and an unsecured claim of $19 million.  Because Drawbridge has stated it will vote to reject confirmation of any plan which pays its unsecured claim pro rata and because its unsecured claim will control the voting in any unsecured class, any plan proposed by Global cannot be confirmed consensually.  If a plan is not consented to, it is still possible to confirm it under 11 U.S.C. § 1129(b), the so-called "cram-down" provision. That section provides that a cram-down plan (less than 100% dividend, over objections of the

affected class) may be confirmed if the plan is "fair and equitable." This in turn requires that

the plan meet the "absolute priority" rule which mandates that no class may receive or retain

anything of value on account of its pre-petition interest unless higher priority claimants are

paid in full. Because Global's anticipated plan, based on the Hampton "offer," would not pay

Drawbridge's claim in full and Global has not introduced specific evidence to support the

conclusion that its plan might satisfy the absolute priority rule of 11 U.S.C. § 1129(b), I find

that there has been no proof that a successful reorganization can occur within a reasonable

time.

 

          Global has alluded to the possibility  that old equity holders may contribute

new value in exchange for their new equity positions so as to satisfy the absolute priority rule

under the "new value" corollary. *See* Case v. Los Angeles Lumber Co., 308 U.S. 106, 121,

60 S. Ct. 1, 10, 84 L.Ed. 110 (1939).  Passage of Section 1129(b)(2)(B)(ii) as part of the 1978

Code calls into question whether the dictum of Case, if ever persuasive, remains so.  *See*

Bank of Am. Nat. Trust and Sav. Ass'n v. 203 North LaSalle St. P'ship., 526 U.S. 434, 462,

119 S. Ct. 1411, 1426-27, 143 L.Ed. 2d 607 (1999) ("No holding of this court ever embraced

the new value exception.");  In re Coltex Loop Cent. Three Partners, L.P., 138 F.3d 39, 44-5

(2d Cir. 1998); In re Woodbrook Assoc., 19 F.3d 312, 320 (7th Cir. 1994); In re Bryson

Props; XVIII, 961 F.2d 496, 504 (4th Cir. 1992); In re Homestead Partners, Ltd., 197 B.R.

706, 711 (Bankr. N.D.Ga. 1996); Piedmont Assoc. v. CIGNA Prop. & Casualty Ins. Co., 132

B.R. 75, 79 (N.D. Ga. 1991).  However, it is not necessary to decide whether a "new value"

corollary applies in this case since Debtor did not meet its burden of proving that the old equity holders will contribute any new value in a hypothetical plan.

Second, '[a] reasonable probability cannot be grounded solely on speculation . . . and a 'mere financial pipe dream' is insufficient to meet the requirements of § 362(d)(2)." In re 6200 Ridge, Inc., 69 B.R. at 843 (citations omitted); *see* In re Anderson Oaks, 77 B.R. at 110 ("The court should not, at the conclusion of the debtor's case, be left to speculate about important elements and issues relating to the likelihood of an effective reorganization."); *see also* In re Ashgrove Apartments of Dekalb County, Ltd., 121 B.R. 752, 756 (Bankr. S.D. Ohio 1990). As stated above, Debtor advances Hampton as the sole financing option. However, the agreement between Debtor and Hampton is still in the negotiation process and there is no certainty that the agreement will ever be consummated.

Third, more is required than a bare assertion by Debtor that the property is necessary for its survival. As stated by the Eleventh Circuit, "the mere fact that the property is indispensable to the debtor's survival is insufficient." In re Albany Partners, Ltd., 749 F.2d at 673 n.7.

Fourth, Global argues that it is preferable to keep the property under bankruptcy protection to permit an orderly competitive bidding process rather than a hasty foreclosure sale. However, Debtor cannot rely solely on the fact that it "wants to forestall

foreclosure so that the property can be sold on the market." <u>In re Park Timbers, Inc.</u>, 58 B.R.

647, 651 (Bankr. D.Del. 1985). It does not have the funds to service the debt, operate the

property, or pay its insurance, taxes, or other bills, and it does not have the capital to cure any

waste or deterioration to the property. "All it has is hope that it can be sold and in the interim

wants [Drawbridge] to bear all the risks." <u>Id.</u>; *see* <u>In re Bellina's Restaurants, II, Inc.</u>, 52

B.R. 509, 512 (S.D. Fla. 1985) (holding that property was not necessary for an effective

reorganization since Debtor was unable to pay its rent for four months, owed trust funds to

the Internal Revenue Service, owed state sales taxes, has not paid the gas, electricity, or waste

collection bills, failed to obtain any additional capital, and has no unencumbered assets that

could serve as collateral for refinancing.).


Of course, at this stage, Global cannot be expected to present a

comprehensive plan proposal. However, Global must demonstrate with reasonable

probability that it can do so. Instead of evidence of at least the broad outlines of a plan that

would have even a colorable possibility of being confirmed, Global and the petitioning

creditors argue, without proof, that (1) the claim of Drawbridge may be subordinated in a

later proceeding; (2) a lender liability suit might be brought; and (3) Global's case may be

consolidated with the just filed, but not adjudicated, involuntary case filed against

Operations. Recognizing that this case is in the nascent stage and the modicum of proof

required to show feasibility of a plan is necessarily low, no credible evidence was introduced

to justify any delay in facing the inevitable, especially in light of the totality of circumstances

surrounding this case, and the indefensible burden that further delays will impose on Drawbridge.

For these reasons, I conclude that the Motion for Relief from Stay filed by Drawbridge will be granted.

### ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the automatic stay of 11 U.S.C. § 362 is lifted to permit Drawbridge Special Opportunities Fund, L.P., to exercise its state law remedies to enforce its claim against Global Ship Systems, LLC; and

IT IS FURTHER ORDERED that the Motion to Dismiss filed by Drawbridge Special Opportunities Fund, L.P., is granted and this case is dismissed.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 21st day of December, 2007.